2011 WY 147

**Leah D. BENJAMIN, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–10–0204.**

Supreme Court of Wyoming.

Oct. 25, 2011.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel. Argument by Ms. Olson.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Senior Assistant Attorney General; Stewart M. Young, Special Assistant Attorney General. Argument by Mr. Young.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Leah D. Benjamin was convicted of second degree murder for the shooting death of her estranged husband.  She appeals that conviction.  We will affirm.

## ISSUES

[¶ 2]   Ms. Benjamin presents four issues:

1. Did the trial court err in not dismissing juror Blaney?

2. Did the trial court err in refusing Appellant's proposed jury instructions G and H?

3. Did the trial court err in denying Appellant's post-trial motion for judgment of acquittal?

4. Did reversible prosecutorial misconduct occur?

### FACTS

[¶ 3] On Sunday, May 3, 2009, Ms. Benjamin shot and killed the victim, Donald Benjamin, at her home in Buffalo, Wyoming. The relevant events of that day began at 9:41 a.m., when Ms. Benjamin sent a text message to her husband, from whom she was separated and was soon to be divorced, asking whether he was coming to pick up their daughter, K.B., to take her fishing. Ms. Benjamin knew that K.B. was at a friend's house, but proceeded to leave numerous voicemails and text messages for Mr. Benjamin stating that K.B. was "sitting here waiting for you," but telling him not to call K.B. because she did not have her phone. When Mr. Benjamin called to say he was on his way, Ms. Benjamin told him that K.B. no longer wanted to go fishing. Mr. Benjamin arrived a few minutes after this conversation, and died approximately an hour later.

[¶ 4] In their briefs, Ms. Benjamin and the State present starkly contrasting versions of the Benjamin relationship. Ms. Benjamin portrays herself as the victim of domestic abuse, while the State portrays her as more the aggressor than the victim. The long record of this eight-day trial includes evidence to support both versions. Most of the details are not relevant to this appeal, however, and will be presented here in summary fashion.

[¶ 5] Ms. Benjamin married Mr. Benjamin in 1999. She had four children from previous relationships, and he had three. They also had a daughter together. The family lived in Hulett, Wyoming, until 2005, when the couple separated and Mr. Benjamin moved to Buffalo, Wyoming. Ms. Benjamin moved to Buffalo in 2006, apparently hoping to reconcile with Mr. Benjamin, although the two continued to live separately. In February of 2009, Mr. Benjamin filed for divorce. Although Ms. Benjamin had signed the divorce settlement agreement, the divorce had not been finalized by the time of Mr. Benjamin's death. Several witnesses agreed that Ms. Benjamin was extremely upset about the pending divorce.

[¶ 6] On Saturday, May 2, 2009, the Benjamin's daughter arranged to spend the weekend with a friend in Buffalo. Although Ms. Benjamin knew their daughter would not be home, she began contacting Mr. Benjamin, telling him their daughter would be waiting at home on Sunday for him to take her fishing. During Saturday afternoon and Sunday morning, Ms. Benjamin made twenty-one telephone calls to Mr. Benjamin, sent ten text messages, and left five voicemail messages. At 10:17 a.m. on Sunday, Ms. Benjamin left the following message:

Don, [K.B. is] sitting here waiting for you. If you don't want to take her fishing at least let us know and I'll go take her to do something OK[?] I told her you were going to take her cause you guys needed time together too OK? I tried to tell you that last night to have you call me but you didn't . . . I don't know whatever.

[¶ 7] At about 10:30 on Sunday morning, Mr. Benjamin telephoned Ms. Benjamin to confirm that he was on his way to her house to pick up their daughter. Ms. Benjamin responded that their daughter no longer wanted to go fishing, expecting that Mr. Benjamin would "turn around and leave." However, Mr. Benjamin arrived at Ms. Benjamin's house a few minutes later. According to Ms. Benjamin, the two sat in the living room and talked. The conversation started calmly, but Mr. Benjamin became increasingly angry, and after about an hour, Ms. Benjamin went into the bathroom to get away from him.

[¶ 8] Ms. Benjamin's testimony was that as she left the bathroom, Mr. Benjamin was standing in the bedroom, near the bathroom door. He appeared angry, and approached her. After that, she explained, "[e]verything happened so fast" that she could not recall the exact sequence of events. She recalled that Mr. Benjamin shoved her into the show-

er door. She hit the shower door with her elbow and, she said, broke the glass door.

[¶ 9] Ms. Benjamin testified that she ran from the bathroom into her bedroom and grabbed her pistol from under her bed. Holding the pistol, she told Mr. Benjamin to leave, and he cursed at her. Then he "lunged" at her and grabbed at the pistol. She shot. Although she could remember shooting only once, she acknowledged that Mr. Benjamin was shot three times. The next thing she recalled was lying on the floor near the bed with Mr. Benjamin on top of her. She threw the pistol behind the night-stand, pushed Mr. Benjamin off of her, and got up from the floor.

[¶ 10] Unknown to Ms. Benjamin, her eighteen-year-old son was also in the house, and he came into the bedroom as Ms. Benjamin was getting up from the floor. Her son helped her up and into the kitchen, then checked on Mr. Benjamin and determined that he was dead. Ms. Benjamin gave her son several thousand dollars she had been saving, and told him to pick up his sister in Buffalo and take her to a relative's home in Gillette "to be safe." After he left, Ms. Benjamin talked on the telephone with some of her children and other people. She sent text messages to her children.[1] She cleaned up glass from the broken shower door. A text message from Ms. Benjamin to her son indicates that, at 5:00 p.m. that evening, she went to a movie in town. Eventually, at the urging of her sons, she drove herself into town and went to the police station.

[¶ 11] She turned herself in at about 4:30 in the morning on Monday, May 4, approximately sixteen hours after shooting Mr. Benjamin. The police officer recorded the interview. In the recording, Ms. Benjamin sounded very emotional and, occasionally, nearly incoherent. She eventually told the police officer that Mr. Benjamin was dead at her home, and that she had shot him around noon the previous day. Because Ms. Benjamin lived outside the town limits, the policeman dispatched officers from the Johnson County Sheriff's department to her home.

They found Mr. Benjamin on the floor of Ms. Benjamin's bedroom between the bed and the wall, and confirmed that he was dead.

[¶ 12] The officers found a relatively small amount of blood at the scene given the gravity of Mr. Benjamin's wounds. There was a small amount of blood on a floor heating vent, on some boxes against the wall, and on a mirror. Upon further inspection, the officers found that the boxes had been deliberately moved and stacked to cover up a small amount of blood on the wall. The officers also found a bloody towel on the bed and later found fifteen damp, freshly washed towels in the washing machine. They also found fourteen dry towels in the dryer.

[¶ 13] Ms. Benjamin was charged with first degree murder. Based on the evidence summarized above, the State argued at trial that Ms. Benjamin had purposely lured Mr. Benjamin to her home under the false pretense that their daughter was waiting for him. It argued that this was a premeditated, purposeful, and malicious effort to harm Mr. Benjamin.

[¶ 14] The State also presented evidence that contradicted Ms. Benjamin's version of the shooting. There was, for example, forensic evidence that there was no gun powder residue on Mr. Benjamin's hands or clothing, indicating that he had been shot at a distance of several feet, not while grabbing the pistol and trying to turn it on her as she had testified. There was also forensic evidence that the shower door was shattered by a bullet, contrary to Ms. Benjamin's testimony that it was broken by her elbow.

[¶ 15] Anticipating Ms. Benjamin's claim that she was a victim of domestic abuse, the State offered testimony indicating that Ms. Benjamin was actually the aggressor in the relationship. Witnesses had observed her initiating confrontations with Mr. Benjamin, and slapping or punching him. One witness testified that Ms. Benjamin "was never afraid to confront him on anything. She was never afraid to be around him." Other witnesses testified that Ms. Benjamin had, on at least

---

1. At 12:56 p.m. on Sunday, Ms. Benjamin sent the following text message to her four sons from previous relationships:

~ Death Leaves a Heartache no one can heal, Love Leaves a Memory no one can STEAL ~
*n(~ * ~ 1~ 4~ 3~ * ~}

two occasions, initiated physical confrontations with a woman Mr. Benjamin had been dating.

[¶ 16] Several witnesses also testified that Ms. Benjamin telephoned Mr. Benjamin with unusual frequency. One acquaintance testified that Ms. Benjamin "called him and called him and called him all of the time," and a former roommate of Mr. Benjamin estimated that she sometimes called up to thirty times per day. Evidence also showed that Ms. Benjamin had been recording many of her telephone conversations with Mr. Benjamin, although her recording device recorded only his side of the conversation, not hers. Based on these arguments and this evidence, the State asked the jury to convict Ms. Benjamin of first degree murder.

[¶ 17] Ms. Benjamin never denied that she had shot Mr. Benjamin, but asserted that she had done so in self-defense. She admitted that she misled Mr. Benjamin about their daughter waiting at home to go fishing with him. She explained that she never expected him to show up, however, and was calling only to "make him feel guilty." According to her testimony, she got the pistol to convince Mr. Benjamin to leave, and shot only after he grabbed the pistol and tried to turn it on her.

[¶ 18] In further support of her self-defense claim, a psychologist testified that Ms. Benjamin was diagnosed as suffering from post-traumatic stress disorder, particularly from a subset of that disorder known as Battered Woman's Syndrome.[2] Ms. Benjamin testified that Mr. Benjamin had hit her on several occasions and frequently verbally abused her. Witnesses for both the defense and the prosecution bolstered her testimony with observations of many arguments, fights, and confrontations between the Benjamins. Several witnesses had seen Ms. Benjamin at various times with black eyes and bruises. There was also testimony that Mr. Benjamin

drank heavily and frequently, and that he could become loud, mean, and violent when he was drinking.

[¶ 19] The jury acquitted Ms. Benjamin on the charge of first degree murder, but also rejected her claim of self-defense, finding her guilty of the lesser included offense of second degree murder. The district court sentenced her to twenty to thirty years in prison. Ms. Benjamin challenges her conviction in this appeal.

## DISCUSSION

### Did the trial court err in not dismissing juror Blaney?

[¶ 20] During voir dire, a potential juror introduced herself as Karen Blaney. A Dr. Blaney was listed by the State as a possible witness to rebut the defense's expert witnesses. The district court pointed this out, and asked Ms. Blaney if they were related. Ms. Blaney said she was married to Dr. Blaney. She explained that he was a psychologist who had consulted with the prosecution, but said that he had never discussed the case with her. Asked by the prosecutor if she could still "be fair to both sides" despite her husband's involvement in the case, Ms. Blaney answered, "I don't often agree with Dr. Blaney, but no. I am a very independent person." Her answer may seem ambiguous when read from the transcript, but it is apparent in the context of the record that everyone understood Ms. Blaney to mean that she could be fair to both sides. No one asked her any more questions. Neither the defense nor the State moved to excuse Ms. Blaney from the jury for cause. Neither side exercised a peremptory challenge against Ms. Blaney, and she was seated on the jury.

[¶ 21] At the end of the day, and outside of the presence of the jury, the district court again raised the issue of Ms. Blaney's rela-

---

2. Wyo. Stat. Ann. § 6–1–203 (LexisNexis 2011) provides as follows:

(a) The "battered woman syndrome" is defined as a subset under the diagnosis of Post-Traumatic Stress Disorder established in the Diagnostic and Statistical Manual of Mental Disorders III—Revised of the American Psychiatric Association.

(b) If a person is charged with a crime involving the use of force against another, and the person raises the affirmative defense of self-defense, the person may introduce expert testimony that the person suffered from the syndrome, to establish the necessary requisite belief of an imminent danger of death or great bodily harm as an element of the affirmative defense, to justify the person's use of force.

tionship to a listed witness.[3] Apparently the judge expressed some surprise that Ms. Benjamin had not moved to excuse Ms. Blaney from the jury. Defense counsel confirmed the decision not to challenge Ms. Blaney for cause, explaining to the district court that "we [the defense] kind of like her" as a juror.

[¶ 22] Dr. Blaney did not testify during the trial, but he was present when the prosecution cross-examined Dr. Finney, a psychologist who diagnosed Ms. Benjamin as suffering post traumatic stress disorder. Later, when the jury was not present, defense counsel told the district court of his concerns about Dr. Blaney's actions:

> [D]uring the cross examination of Dr. Finney, [Dr.] Blaney was seated behind the prosecutor and appeared to be just participating with the prosecutor as sort of like a team member, and he rushed up to the prosecutor's table sort of like, here, I show you this, and it would have given the jury the impression that he had a passionate view opposite of what was being said, and certainly would have given his wife that impression. We have alternates and I want to use an alternate and not [Ms. Blaney], because of that. God knows what effect that would have on her. It showed that he was not a sworn witness testifying about something. It showed that he was participating with the prosecutor to try to discredit Dr. Finney. And I think—And we are very concerned that might cause an effect on Ms. Blaney.

Defense counsel asked to have Ms. Blaney removed from the jury, but the district court denied the request.

[¶ 23] On appeal, Ms. Benjamin challenges this decision. She claims that Ms. Blaney's presence on the jury impinged upon her constitutional right to a fair and impartial trial.

> The Sixth Amendment to the Constitution of the United States and Art. 1 § 10 of the Wyoming Constitution guarantee the accused in a criminal proceeding a trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961); *Collins v. State*, 589 P.2d

1283, 1289 (Wyo.1979). The constitutional right to due process also guarantees a criminal defendant's right to an impartial jury. *See Ristaino v. Ross*, 424 U.S. 589, 595, n. 6, 96 S.Ct. 1017, 1020, n. 6, 47 L.Ed.2d 258, 263 (1976). An impartial jury consists of those jurors who will conscientiously apply the law and find the facts. *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1985). Impartiality is not measured easily by tests as it is not a technical conception but rather a state of mind. *United States v. Wood*, 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78, 88 (1936).

*Miller v. State*, 904 P.2d 344, 352 (Wyo.1995).

[¶ 24] Ms. Benjamin does not contend that Ms. Blaney was actually biased. Rather, she asserts that "[t]his is a claim of implied bias on the part of [Ms.] Blaney." We have previously explained the difference between actual bias and implied bias:

> [A] party can obtain a new trial by showing that the juror had an actual or implied bias. A finding of actual bias is based upon express proof, e.g., . . . admission by the prospective juror of a state of mind prejudicial to a party's interest. Actual bias is a factual finding reviewed for clear error. A determination on a claim of implied bias, on the other hand, is a question of law reviewed *de novo*. Implied bias can be proved by showing that the juror had a personal connection to the parties or circumstances of the trial or when there are similarities between the personal experiences of the juror and the issues being litigated.

*Smith v. State*, 2008 WY 98, ¶ 29, 190 P.3d 522, 531–32 (Wyo.2008) (internal citations and some punctuation omitted).

[¶ 25] Ms. Benjamin claims that Ms. Blaney should have been removed from the jury on the basis of implied bias because of her relationship to Dr. Blaney, a listed witness for the prosecution. Relying on *Smith*, as quoted above, she asserts that this is an issue of law to be reviewed *de novo*. The State counters that Ms. Benjamin did not

---

**3.** Although this discussion was not transcribed and is not preserved in the record, we can discern what occurred because the district court later described the discussion on the record.

move to excuse Ms. Blaney for cause during voir dire, and because "there was no contemporaneous objection below," Ms. Benjamin's claim must be reviewed for plain error.

[¶ 26] We agree with the State that, in cases in which the parties raised no objection at trial, we generally review for plain error. *See Jones v. State*, 2011 WY 114, ¶ 10, 256 P.3d 527, 532 (Wyo.2011); *Tucker v. State*, 2010 WY 162, ¶ 28, 245 P.3d 301, 309 (Wyo.2010). If we were asked to decide whether the district court should have removed Ms. Blaney from the jury during voir dire despite defense counsel's lack of objection, then we might apply the plain error standard of review. However, it is clear from Ms. Benjamin's brief that she is not challenging the district court's decision during voir dire to leave Ms. Blaney on the jury. Instead, she is challenging the district court's denial, near the end of the trial, of her request to remove Ms. Blaney from the jury. Given this explicit objection by defense counsel, review for plain error is not appropriate.

[¶ 27] On the other hand, Ms. Benjamin's assertion that we must review the issue *de novo* is based on an oversimplification of our decision in *Smith*. When we are faced with a straightforward question of whether, as a matter of law, the district court should have removed a juror or jurors because of implied bias, then *de novo* review may be appropriate. For example, in *State v. Dobbs*, 70 Wyo. 26, 244 P.2d 280 (Wyo.1952), we "assumed prejudice when noncompliance with the selection procedures caused a significant number of nonqualified jurors to be empaneled." *Miller*, 904 P.2d at 353. Although the standard of review was not explicitly set forth in *Dobbs*, it is apparent that the Court undertook a *de novo* review: "The question ... before us is as to the effect of the 36% error and mistake in the jury list and in the panel." *Dobbs*, 244 P.2d at 282.

[¶ 28] In other cases and other contexts, questions involving implied bias have been reviewed for an abuse of discretion. In *Miller*, 904 P.2d at 351, for example, "a potential juror expressed his belief in front of the rest of the panel that [the defendant] had previously stolen the juror's horse." The district court denied Mr. Miller's motion for a mistrial. We reviewed that decision "under an abuse of discretion standard" and we concluded that "a mistrial should have been granted and the failure to grant one was an abuse of discretion." *Id.* at 351, 354. To similar effect is *Lee v. State*, 743 P.2d 296, 299 (Wyo.1987). A juror in that case had previously served on the jury in a related case. We concluded that the district court "abused its discretion in refusing to grant the challenge for cause." In *Majors v. State*, 2011 WY 63, ¶ 15, 252 P.3d 435, 440 (Wyo. 2011), we concluded that it was error to appoint one of the investigating officers as bailiff for the jury, but continued that, "in resolving whether the district court abused its discretion by denying the motion for a mistrial, ... we must consider the potential for prejudice." We found no prejudice. "Consequently, the district court did not abuse its discretion by denying Ms. Majors' motion for a mistrial." *Id.*, ¶ 21, 252 P.3d at 441.

[¶ 29] The lesson we take from these cases is that not every question involving implied bias is subject to *de novo* review on appeal. The proper standard of review must be adapted to fit the context in which the question is presented. Accordingly, we must consider the context in which Ms. Benjamin's issue comes before us.

[¶ 30] During voir dire, Ms. Benjamin did not move to strike Ms. Blaney from the jury for cause. As the district court later explained,

> Well, I have always been concerned about [Ms. Blaney]. I was surprised that nobody made a motion for cause. I probably would have granted it, but nobody did. I am not the lawyer in the case.

We have previously established that "failure to challenge a juror, and then later acceptance of the panel at trial, waives any objection to the service of a particular juror." *Kerns v. State*, 920 P.2d 632, 635 (Wyo.1996). Ms. Benjamin clearly waived any objection to Ms. Blaney's service on the jury. Moreover, given counsel's indication to the district court that the defense "kind of like" Ms. Blaney as a juror, it appears that this waiver was a

deliberate decision based on trial strategy considerations.

[¶ 31] Near the end of the trial, defense counsel objected to Ms. Blaney's remaining on the jury. At that point, the district court reminded defense counsel that Ms. Blaney's relationship to Dr. Blaney had been revealed during voir dire, and suggested "that is the time to raise this issue." The district court inquired whether defense counsel had "thought about it and changed your position." Defense counsel responded: "Well, we thought about it and observed what happened and we think that changes our position about her."

■ [¶ 32] To the extent that Ms. Benjamin's objection was based on "what happened," it does not raise a question of law that should be reviewed *de novo*. The district court observed "what happened," and was in a better position than we are to evaluate Dr. Blaney's actions. In such circumstances, we should "not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record." *Gruwell v. State*, 2011 WY 67, ¶ 25, 254 P.3d 223, 231 (Wyo.2011), quoting *Seward v. State*, 2003 WY 116, ¶ 32, 76 P.3d 805, 819 (Wyo. 2003). Because we traditionally afford district courts considerable discretion in the proper conduct of trials, it follows that the district court's denial of Ms. Benjamin's request to remove Ms. Blaney from the jury should be reviewed for an abuse of discretion. In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. *Breazeale v. State*, 2011 WY 10, ¶ 30, 245 P.3d 834, 843 (Wyo.2011).

■ [¶ 33] When Ms. Benjamin sought to remove Ms. Blaney from the jury based on "what happened" with Dr. Blaney, the question before the district court was whether the circumstances had changed sufficiently to require reconsideration of Ms. Benjamin's previous waiver of any objection to Ms. Blaney's serving on the jury. As the district court observed, many circumstances had not changed at all. Prior to trial, the State had designated Dr. Blaney as a witness who might testify to rebut the defense's expert witness. Ms. Blaney had revealed during

voir dire that she was married to Dr. Blaney and that she was aware that he was a consultant on the case.

[¶ 34] The only circumstance that had changed was that Dr. Blaney did not testify, but instead reacted visibly during the cross examination of Dr. Finney. Defense counsel posited that Dr. Blaney's participation "would have given the jury the impression that he had a passionate view opposite of what was being said." But as the district court explained, it "would have been more concerned had [Dr.] Blaney actually testified." If Dr. Blaney had testified instead, his disagreement with Dr. Finney would have been made explicit rather than implied by his actions. The district court determined that Dr. Blaney's actions during trial had less negative impact than if he had testified to his disagreement with the defense expert, and so concluded that the circumstances had not changed sufficiently to compel the removal of Ms. Blaney from the jury.

[¶ 35] We are satisfied that the district court's conclusion was reasonable. Ms. Benjamin had waived her implied bias objection to Ms. Blaney during voir dire. We conclude that the district court did not abuse its discretion when it denied Ms. Benjamin's request, late in the course of the trial, to remove Ms. Blaney from the jury.

### Did the trial court err in refusing Appellant's proposed jury instructions?

■ [¶ 36] During the jury instruction conference, Ms. Benjamin proposed these two jury instructions:

#### Instruction No. G

Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, her testimony cannot be arbitrarily rejected, and if her credibility has not been impeached, and her testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then her testimony should be accepted.

Instruction No. H

[Ms. Benjamin] being the sole witness to the transaction charged as a crime, her testimony must be accepted as true, if it is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith.

The district court refused to give the instructions. Ms. Benjamin claims that the district court's decision was in error.

[¶ 37] When reviewing questions involving jury instructions, we afford significant deference to the trial court's decisions. *Farmer v. State*, 2005 WY 162, ¶ 20, 124 P.3d 699, 706 (Wyo.2005). "A trial court is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the instructions in their entirety sufficiently cover[ ] the relevant issue, reversible error will not be found." *Roden v. State*, 2007 WY 200, ¶ 21, 173 P.3d 369, 375 (Wyo.2007), quoting *Duke v. State*, 2004 WY 120, ¶ 90, 99 P.3d 928, 954 (Wyo.2004).

[¶ 38] Ms. Benjamin argues on appeal, as she did before the district court, that her proposed instructions were supported by our holding in *Eagan v. State*, 58 Wyo. 167, 198, 128 P.2d 215, 226 (1942):

Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted.

This holding has been referred to as the "*Eagan* Rule." *See, e.g., Butcher v. State*, 2005 WY 146, ¶ 25, 123 P.3d 543, 551 (Wyo. 2005).

[¶ 39] The State concedes that Ms. Benjamin was the only witness to the shooting of Mr. Benjamin. It claims, however, that the "*Eagan* Rule" is inapplicable in this case because Ms. Benjamin's credibility had been impeached, and her testimony was not consistent with other facts and circumstances shown. Having reviewed the trial transcript, we agree with the State. Several examples can be found in the record, but one will be sufficient to illustrate that Ms. Benjamin was impeached, and that her testimony was inconsistent with other evidence.

[¶ 40] When Ms. Benjamin turned herself in at the police station, she told the officer that she and Mr. Benjamin had "fought over the gun." She said that she was "just trying to scare him," but he grabbed the pistol, and she "just shot." These statements were consistent with a note Ms. Benjamin had written and left at her home, in which she said that "I grabbed the gun to scare him out of here. He grabbed it. I shot and he tried to turn the gun on me and I just kept shooting." At trial, Ms. Benjamin first testified that she shot Mr. Benjamin when he "lunged" at her, but later asserted that Mr. Benjamin "tried to turn [the gun] around on me and I just shot."

[¶ 41] A pathologist, called as an expert witness by the State, testified that no gun powder residue was found anywhere on Mr. Benjamin's body or clothing. According to this witness, the lack of residue indicated that the shots had been fired from "several feet away." Two other witnesses, a forensic analyst from the state crime lab and an expert who specialized in firearms, also testified that the absence of gun powder on Mr. Benjamin meant that the shots had been fired from a distance of three or four feet or more. The pathologist concluded that the lack of gun powder residue on Mr. Benjamin's hands indicated that he was not grabbing the pistol when it went off. The other expert confirmed this point:

I don't believe they were close enough to struggle over the gun. If he had his hands close to the gun, not only the muzzle puts out gun powder but the cylinder gap between the cylinder as it rotates in the back of the barrel, that puts out some powder residue. And typically when you have somebody that is struggling over a gun when it goes off, you have some residue on the skin or the clothing next to that. And that was not there.

[¶ 42] Ms. Benjamin's statements and testimony that Mr. Benjamin had grabbed the pistol when it went off are not consistent with the physical evidence and expert testimony indicating the shots were fired from

several feet away. The "*Eagan* Rule" applies only if the witness's "credibility has not been impeached" and "is not inconsistent with the facts and circumstances shown." *Eagan,* 128 P.2d at 226. It therefore did not apply in Ms. Benjamin's case, and the district court did not err in refusing the "*Eagan* Rule" instructions she proposed.

### Did the trial court err in denying the post-trial motion for judgment of acquittal?

[¶ 43] After trial, Ms. Benjamin filed a motion for judgment of acquittal pursuant to W.R.Cr.P. 29(c), asserting that the State had failed to prove beyond a reasonable doubt that she did not act in self-defense. The district court denied the motion, and Ms. Benjamin challenges that decision. She claims that the State failed to prove that she did not act in self-defense because it presented "no evidence of Ms. Benjamin's state of mind at the time of the shooting."

[¶ 44] Motions for judgment of acquittal should be granted "when it may be said as a matter of law that there is no evidence of guilt whatsoever in the record or where there is no substantial evidence from which reasonable [jurors] may say that the defendant is guilty beyond a reasonable doubt." *Chavez v. State,* 601 P.2d 166, 170 (Wyo.1979).

> In reviewing the sufficiency of the evidence in the context of a denial of a motion for judgment of acquittal, we examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.

*Najera v. State,* 2009 WY 105, ¶ 5, 214 P.3d 990, 992 (Wyo.2009), quoting *Martin v. State,* 2007 WY 2, ¶ 32, 149 P.3d 707, 715 (Wyo. 2007) (citations omitted).

[¶ 45] Ms. Benjamin correctly points out that the State had the burden of disproving her claim of self-defense beyond a reasonable doubt. *Olson v. State,* 960 P.2d 1019, 1021 (Wyo.1998). Consistent with this precedent, the district court properly instructed the jury that "Before [Ms. Benjamin] may be convicted of any crime, the State must prove beyond a reasonable doubt that [Ms. Benjamin] did not act in self-defense." The jury was also instructed:

> If [Ms. Benjamin] believed that she was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing that she was in similar danger, [then Ms. Benjamin] would be justified in using deadly force in self-defense.

[¶ 46] Our review of the record confirms Ms. Benjamin's claim that the State presented no **direct** evidence of her state of mind at the time of the shooting. The only direct evidence of that was her own testimony that she feared Mr. Benjamin was going to hurt her, and that she acted to prevent that. We have previously observed, however, that "in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 843 (Wyo.1980) (emphasis omitted), quoting *Widener v. Pacific Gas & Electric Co.,* 75 Cal.App.3d 415, 435, 142 Cal.Rptr. 304, 314 (1977), *overruled on other grounds by McCoy v. Hearst Corp.,* 42 Cal.3d 835, 846 n. 9, 231 Cal.Rptr. 518, 525 n. 9, 727 P.2d 711, 719 n. 9 (1986). The State claims that there was sufficient evidence of the surrounding facts and circumstances to allow a reasonable jury to draw the inference that Ms. Benjamin did not act in self-defense. We keep in mind, as we evaluate this claim, that we "accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant." *Najera,* ¶ 5, 214 P.3d at 992.

[¶ 47] The evidence viewed in this way was sufficient to disprove that Ms. Benjamin acted in self-defense. The prosecution pre-

sented evidence that Ms. Benjamin had been extremely angry and upset about the pending divorce from Mr. Benjamin and about his relationship with another woman. It presented evidence suggesting that Ms. Benjamin pressured Mr. Benjamin—"lured" him, as the State put it—to come to her home to pick up their daughter, even though Ms. Benjamin knew that the daughter was not there. A little more than an hour after Mr. Benjamin arrived, Ms. Benjamin shot him three times. Some of her testimony about the incident was inconsistent with the physical evidence.

[¶ 48] In particular, as discussed above, she testified that she shot Mr. Benjamin when he grabbed the gun and tried to turn it on her. However, there was no gunpowder residue on Mr. Benjamin or his clothing, indicating that he had been shot from a distance of at least several feet. There was evidence that Ms. Benjamin had been the aggressor in past confrontations with Mr. Benjamin, and testimony that she was not afraid of him. Finally, we note that Ms. Benjamin delayed reporting the shooting for approximately sixteen hours.

[¶ 49] This provided sufficient evidence for a jury to make reasonable inferences about Ms. Benjamin's state of mind. It provided an adequate basis for the jury to reject Ms. Benjamin's testimony that she believed she was in imminent danger of death or serious bodily harm at the time of the shooting. The district court did not err in denying Ms. Benjamin's motion for a judgment of acquittal.

***Did reversible prosecutorial misconduct occur?***

[¶ 50] In her fourth issue, Ms. Benjamin complains of several instances of alleged misconduct on the part of the prosecution at trial. "Allegations of prosecutorial misconduct are settled by reference to the entire record and 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.'" *Schreibvogel v. State*, 2010 WY 45, ¶ 39, 228 P.3d 874, 887 (Wyo.2010), quoting *Mazurek v. State*, 10 P.3d 531, 542 (Wyo.2000). Two of the asserted instances of prosecutorial misconduct were objected to at trial, and we will review them by applying a harmless error standard. *Harris v. State*, 2008 WY 23, ¶ 12, 177 P.3d 1166, 1170 (Wyo.2008). The instances not objected to will be reviewed for plain error. *Schreibvogel*, ¶ 39, 228 P.3d at 887.

[¶ 51] The first instance of asserted misconduct occurred during voir dire. Ms. Benjamin contends that the prosecutor made improper comments about the personal background of the assistant prosecutor. The prosecutor called his co-counsel "a carpet bagger from Chicago," said that he was a graduate of the University of Wyoming and had spent four years as a prosecutor in Rock Springs. Defense counsel objected to these comments. The district court sustained the objection, reminding the prosecutor that it was not appropriate "to pass out the resume."

[¶ 52] Ms. Benjamin points out that W.R.Cr.P. 24(c)(2) prohibits comment on the personal lives of the attorneys involved in a case. We have previously stated, however, that "[T]he limitations placed on voir dire by the Wyoming Rules of Criminal Procedure are flexible, and purposely so, so as to allow the trial court discretion in that important process." *Person v. State*, 2004 WY 149, ¶ 33, 100 P.3d 1270, 1286 (Wyo. 2004). Although the trial court sustained defense counsel's objection, the preference for flexibility in the voir dire process nonetheless guides our review on appeal. The prosecutor's comment that the assistant was a "carpet bagger" was plainly an attempt at humor rather than a reference to his personal life. In context, the comments were a preface to questions about whether anyone on the jury panel would hold against the State anything that the two prosecutors may have done in their various jobs. Considering this context, the information imparted by the prosecutor could be deemed useful in discovering any bias that the jurors may have had. Accordingly, given that the trial court's discretion is justified with this objective in mind, we cannot say that the comments amounted to misconduct. Even if the comment could be considered improper, Ms. Benjamin has not articulated how it was harmful to her. Indeed, as the comment

was meant to reflect negatively on the assistant prosecutor, we cannot perceive that it was prejudicial to Ms. Benjamin.

[¶ 53] The second instance also occurred during voir dire. Ms. Benjamin asserts that the prosecutor made an improper statement about her defense counsel:

[Prosecutor]: Okay. Picking a jury is never easy. There is always somebody that you look out there and you say darn, I should know that person and there is a story behind it. You look familiar. Do I know you? And the lady answers, yes, I know you. I have known you since you were a young boy. And you say, well, what do you know of me? Well, I know you drink too much, you cheat on your wife, you are generally no good, and I would not believe anything you said. Dang, I shouldn't have asked that question. Well, do you know the defense attorney? Yes, I have known him since he was a young boy. What do you think of him? Well, he cheated his way through school, he drinks too much, he has a gambling problem, and I would not believe a word he has to say.

[Defense Counsel]: Your Honor, these kind of jokes have no purpose in voir dire at all and they are improper.

THE COURT: Sustained. Please proceed.

[¶ 54] Ms. Benjamin cites authority from several other jurisdictions that disparaging remarks directed toward defense counsel have no place in a courtroom, and clearly constitute misconduct. We may be willing to apply this rule in Wyoming as well, but contrary to Ms. Benjamin's claim, these comments cannot reasonably be interpreted as an insult to defense counsel. Even in his objection, defense counsel referred to the comments as "jokes." The prosecutor did not seriously contend that defense counsel had cheated in school or drank too much, any more than he meant to indicate that he himself had cheated on his wife or lacked credibility. Read in context, the comments appear to be part of an effort to put prospective jurors at ease about revealing information they might know about the parties, the witnesses, or the attorneys. Such jokes may or

may not be an effective voir dire technique, but we cannot say that they constituted prosecutorial misconduct.

[¶ 55] Third, Ms. Benjamin objects to remarks made during the prosecutor's opening statement. After telling the jury it would hear evidence that Mr. Benjamin was "mean" and a "drunkard," the prosecutor continued, "You will also hear that he was somebody's son, somebody's brother, four kids' father, a good worker, a good friend. Somebody that would help people." Ms. Benjamin did not object below, but now contends that these comments were improper references to victim impact. Reviewing for plain error, we note that the record is clear as to what the prosecutor said. We turn then to the second and third prongs of the analysis, determining whether a clear rule of law was violated and whether a substantial right has been denied causing material prejudice to the defendant. We note that the defendant bears the burden of proving prejudice. *Teniente v. State*, 2007 WY 165, ¶ 10, 169 P.3d 512, 520 (Wyo.2007).

[¶ 56] The prosecutor stated that Mr. Benjamin was a son, brother, and father. These were facts supported by the evidence and, moreover, did not indicate anything about the impact of Mr. Benjamin's death on his relatives. The prosecutor also asserted that Mr. Benjamin was a good worker and good friend. This similarly indicated nothing about the impact of his death on his co-workers or friends. Ms. Benjamin does not cite to any authority supporting her conclusion that the statements amounted to "victim impact testimony." In consideration of Ms. Benjamin's failure to provide any authority by which we can compare the prosecutor's statements to victim impact testimony, we turn to our general definition of victim impact evidence: "Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *Sweet v. State*, 2010 WY 87, ¶ 41, 234 P.3d 1193, 1207 (Wyo.2010). The statements made by the prosecutor simply did not address the "physical, emotional, or social im-

pact" of the crime, and the statements did not create any inferences that could not otherwise have been drawn from the mere fact of the victim's death. Further, because there was no suggestion of victim impact in these statements, we do not perceive how they could have prejudiced Ms. Benjamin. Indeed, Ms. Benjamin concedes that "Standing alone, these comments might be held to be harmless," but she states that when these comments are added to statements made during closing arguments, she was denied her right to a fair trial.[4] In recognition of the rule that allegations of prosecutorial misconduct are examined with "reference to the entire record," *Mazurek*, 10 P.3d at 542, we acknowledge that our review should encompass the cumulative effect of the alleged instances of misconduct. But our review of the total effect of such instances does not warrant acceptance of conclusory allegations regarding individual incidents where there has been no attempt to demonstrate prejudice. We conclude that the comments did not amount to prosecutorial misconduct, and that Ms. Benjamin has not met her burden of proving that prejudice resulted from the statements. We find no reversible error in the prosecutor's opening statement.

[¶ 57] Fourth, Ms. Benjamin cites several instances in the prosecutor's closing argument in which he reminded the jury that it would never hear Mr. Benjamin's side of the story. Again, in the absence of an objection below, we review for plain error. To support her claim that such remarks were improper, Ms. Benjamin cites a Pennsylvania case, *Commonwealth v. Beavers*, 492 Pa. 522, 424 A.2d 1313, 1315 (1981). This case indicates that a prosecutor may not tell the jury what he believes a victim would have testified if he were still alive. However, the prosecutor here told the jury only that Mr. Benjamin was not there to testify. He did not suggest how Mr. Benjamin might have testified if he were still alive. Once again, Ms. Benjamin provides no authority, and presents no clear and unequivocal rule of law, to support an assertion that it is improper to tell the jury

that it will not hear the victim's side of the story. Additionally, Ms. Benjamin does not argue that she was prejudiced by this statement, other than to assert that the prosecutor improperly interjected "this issue" into the minds and deliberations of the jury. We fail to see how raising the fact of the victim's death resulted in undue prejudice to Ms. Benjamin, and, as a result, do not find plain error.

[¶ 58] Fifth, Ms. Benjamin complains that the prosecutor "speculated and created scenarios" that were "unsupported by any evidence." In particular, she complains that the prosecutor presented a version of the shooting in which "Mr. Benjamin, not Ms. Benjamin, had gone back to use the bathroom, and Ms. Benjamin followed him and got the gun, and Mr. Benjamin turned around and she was there with the gun." She also objects to the prosecutor's argument that Ms. Benjamin removed her bloody clothes, then put them back on before turning herself in at the police station. In both instances, Ms. Benjamin asserts that these arguments lack any factual support. In both instances, no objection was made below, and we will review for plain error.

[¶ 59] We agree with Ms. Benjamin's contention that closing arguments must be based on the evidence admitted at trial. "Wide latitude is allowed in discussing inferences to be drawn from the evidence. However, prosecutors must limit their closing arguments to commenting on the evidence." *Condra v. State*, 2004 WY 131, ¶ 22, 100 P.3d 386, 392 (Wyo.2004). "To the extent that [a prosecutor's] observation is not reflected by the evidence, it was an improper comment." *Seyle v. State*, 584 P.2d 1081, 1087 (Wyo.1978). We disagree, however, with Ms. Benjamin that the prosecutor's arguments in this case lacked factual support.

[¶ 60] To analyze the prosecutor's remarks, we find it helpful to consider the full text of the argument rather than a characterization of it. During closing argument, the prosecutor stated as follows:

---

4. Ms. Benjamin also challenges similar statements made by the prosecutor during his closing argument. For the reasons just discussed, we also conclude that this argument was not improper.

[Ms. Benjamin] will also tell you that she left the argument and went back to the bathroom. Let[']s talk about that bathroom a little bit. Thirty inches between the shower door and the front of the stool. This door you have seen in the pictures. You will have the pictures.

Originally the thought was maybe they are both in there. How did—Where was [Ms. Benjamin] positioned and where was the victim's position? Because if [Ms. Benjamin] was in here, then the victim would have to crowd in here, maybe here, get his feet positioned and then push her into the shower door. Or if [she] is out here, then somehow she would have to get pushed, make several steps back into the shower door and bang into it but not so hard that she would be flying through or fall inside of the shower, but hard enough to break it and somehow injure her right arm in the process.

**Or, if [Mr. Benjamin] went back to that bathroom and was using the restroom and then turned around and [Ms. Benjamin] had a gun,** I submit to you that makes more sense. There is no way there is a pushing and shoving match in here and the shower door got broke, and [Ms. Benjamin] tells you that she pushed past, somehow, [Mr. Benjamin] and traveled over here, this twenty some feet, recovered a gun from under the bed there and came back, stood about here, that she had a conversation or exchanged words with the victim and then she shot him after he charged [her].

Ask yourself when you are judging the possibility of that story, why would the victim be standing in that bathroom[?] The only explanation [Ms. Benjamin] was able to give you was that he was looking at the glass, at the broken door, but if the door was not broken until he was shot, why is he standing around looking at it, maybe while she travels these forty feet round trip and shows up with a gun? And then if he is pushing her, how does she get out of there? If there is really a fight going on, or a push, she says, I am out of here, and he stands around in the bathroom and waits and she gets the gun and comes back and says, get out of here. The

physical evidence at the scene does not support the testimony of [Ms. Benjamin]. The prior story of [Ms. Benjamin] doesn't support the physical evidence.

Sometime during the next twenty-four hours, or the next fifteen hours, rather, [Ms. Benjamin] leaves the scene at least once to go to the police station. We know that. She does not remember if she sent another—She sent a text saying I am in town, but she does not recall if she did that. She texts. She calls folks. She leaves this note, death leaves a heartache no one can heal text message. She does some tidying up around the scene, and never does she call the authorities until she goes in at 4:20 in the morning.

If she did leave the scene before that—I submit to you that you will see a photograph of her clothing setting on the vanity there in the bathroom. On top of that clothing is the cosmetic bag. Stuffed inside of the cosmetic bag is the note that is Exhibit 27 that is saying that I killed [Mr. Benjamin]. This was found crumpled up inside of the bag. **I submit to you that she put clothes on and left the scene and came to town. She decided she could not turn herself in, and we will never know that, and went back home, and before 4:30 a.m., replaced the bloody clothes on her person.**

Why would she say that she did not have blood on my underwear? Did you have blood on you? I don't know, all I had was the socks and underwear. Question, well, it soaked through, right? Answer, well, they did not take those. They did not take my socks. Then she also says to Officer Simeral, I have blood on my clothes. I did not even change or anything.

Look at that photograph. Think about the testimony. Draw the reasonable inferences that you can from the facts of the case. She was prepared with the note. She was prepared to provide her story. Remember when she told Officer Simeral—I asked, was that a response to a question, and he said, no, she just stated that.

He shoved me into the shower. She had that statement prepared for him.

(Emphasis added.)

[¶ 61] As discussed earlier, Ms. Benjamin provided the only eye-witness testimony about the shooting incident. The prosecutor's argument did postulate a scenario somewhat different from Ms. Benjamin's testimony, but as also discussed earlier, Ms. Benjamin's testimony was not entirely consistent with some of the physical evidence. Of particular significance here, she testified that the shower door broke when Mr. Benjamin pushed her into it, while forensic evidence indicated that the door was shattered by a bullet. This provided a factual basis for the prosecutor to question Ms. Benjamin's testimony that Mr. Benjamin was standing in the bathroom looking at the broken shower door before any shot was fired. This was a sufficient basis for the prosecutor to posit that Mr. Benjamin had been in the bathroom when Ms. Benjamin followed him with the pistol. Given that the physical evidence contradicted Ms. Benjamin's testimony on multiple points, and that a prosecutor is allowed "wide latitude" in discussing inferences drawn from the record, we conclude that the prosecutor's argument violated no clear and unequivocal rule of law.

[¶ 62] With regard to the bloody clothing, when Ms. Benjamin turned herself in at the police station, there was a significant amount of blood on Ms. Benjamin's clothing, but none on her underwear. This provided a factual basis from which the prosecutor could properly draw an inference that Ms. Benjamin had removed her bloody clothing, including the underwear, then put the clothing back on over clean underwear. The prosecutor's argument was sufficiently based on the trial evidence, and did not constitute plain error.

[¶ 63] Finally, Ms. Benjamin objects to the prosecutor's characterization of Battered Woman's Syndrome:

I think that folks have a general common sense idea of what a domestic violence cycle or domestic violence pattern relationship is. The idea is that the abuser is in constant control of the victim of that violence. The abuser lives with them, of course. Sometimes imprisons them and does not let them out of the house. The abuser controls their every movement. . . .

The abuser may control and beat them and then reconcile. You heard that testimony from the expert, there is reconciliation and the honeymoon to draw the victim back in there, and then the abuse begins anew and it is worse than before. The victim of that kind of abuse has this learned helplessness. You heard about that. They are so downtrodden and beat down and broke that they cannot help themselves, that they cower in the face of these situations and cannot do anything.

The prosecutor further asserted that Ms. Benjamin was not under Mr. Benjamin's control, as they had separated and were living apart. He asserted that she was not downtrodden and broken, but to the contrary, she was often the aggressor in confrontations with Mr. Benjamin. In sum, the prosecutor argued that Ms. Benjamin's characteristics did not match those of someone suffering from Battered Woman's Syndrome.

[¶ 64] Ms. Benjamin claims that this characterization of Battered Woman's Syndrome was not supported by any evidence. Our review of the record, however, reveals testimony about the extent of control an abuser exerts over a battered woman. There was evidence about cycles of reconciliation followed by renewed violence. Ms. Benjamin's social worker and a psychologist gave testimony relating to the "cycle of violence" associated with Battered Woman's Syndrome, including the extent to which an abuser may control the victim. Specifically, there was testimony that the relationship is often marked by a honeymoon period, after which the cycle will start over again, many times involving escalating acts of violence. There was also evidence that individuals suffering from Battered Woman's Syndrome often respond to events with strong feelings of fear and helplessness. The psychologist testified that "there is almost always in Battered Woman's Syndrome really low self-esteem of a victim and the traumatic bonding between the victim and the perpetrator. The traumatic bonding is that—[i]t is really diffi-

cult to understand for most of us but the more violence there is, the stronger the attachment is between the two people." Further, Ms. Benjamin's social worker testified that a common feature of Battered Woman's Syndrome is "an imbalance of power" between "the captive and caregiver," a statement invoking an implication of forced confinement or subjugation. In light of this testimony, we find adequate evidence to support the prosecutor's arguments.

[¶ 65] We do not conclude that the prosecutor misstated the evidence. Rather, he sought to convey the evidence using descriptive language that was not specifically used by the witnesses, but that may fairly be inferred from their testimony. We also find no showing by Ms. Benjamin that she suffered prejudice from the prosecutor's arguments. Accordingly, she has not demonstrated any prejudicial misconduct.

[¶ 66] Individually and collectively, the instances pointed out by Ms. Benjamin do not constitute prosecutorial misconduct.

### CONCLUSION

[¶ 67] Affirmed.