424 A.2d 1313
COMMONWEALTH of Pennsylvania,

v.

Willie James BEAVERS, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 2, 1980.

Decided Feb. 4, 1981.

Leonard G. Ambrose, III, Philip B. Friedman, Ambrose & Friedman, Erie, Edward A. McQuoid, Pittsburgh, for appellant.

Michael J. Veshecco, Dist. Atty., Paul J. Susko, Asst. Dist. Atty., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

Appellant, Willie James Beavers, was convicted by a jury of murder of the third degree for the shotgun slaying of Earl Denard. Post-verdict motions were denied and appel-

lant was sentenced to a prison term of eight-to-sixteen years. This direct appeal followed.

Appellant first argues that the trial court erred in denying appellant's motion for a mistrial following certain cross-examination of the appellant by the prosecutor. During cross-examination of appellant, the following exchange occurred:

"BY MR. PALMISANO [Assistant District Attorney]:

"Q. Let me just ask you this, Mr. Beavers. Earl Denard, he's the victim. Right?

"A. Yeah.

"Q. He got shot that day in your place.

"A. Yeah.

"Q. You had the gun that shot him.

"A. Yeah.

"Q. And he's dead.

"A. Yes.

"Q. And you're alive, so you can come in and tell these people what your version of it is, isn't it?

"A. It's the true version.

"Q. But Earl Denard, he's the victim; he can't be here to tell these people what took place, can he?

"MR. AMBROSE: I would object to that, Your Honor.

"THE COURT: Objection sustained.

"MR. AMBROSE: That's improper and it's prejudicial and I move for a mistrial on that.

"THE COURT: I would deny your motion for a mistrial but, members of the jury, you should understand that the last phraseology, so-called question by the District Attorney, is improper and should be disregarded by you. It's more a matter for argument than anything else.

We have, on numerous past occasions, held improper any remarks by a prosecutor concerning the "testimony" a homicide victim would have given had he or she not been slain. For instance, in *Commonwealth v. Lipscomb*, 455 Pa. 525, 526–27, 317 A.2d 205, 206 (1974), we granted a new trial where the prosecutor argued during closing remarks that:

"You know, my best witness isn't here today. But if he could come back, if Mr. Sweeney could come back and sit in this chair and face you, the jurors, I believe he would say, 'I didn't want to die. I was only 59 years of age. I think I had a number of years ahead of me, I didn't want to die. I was just walking along the street, a friend had been kind enough to give me a little bag of groceries to help me out because I was unemployed at the time, and I was on my way home, walking the route I have walked many, many times from my friend's house.

" 'I didn't want to die. I didn't know this would be my last walk. I didn't know that a bunch of hoodlums and animals would pounce upon me and tear me apart and would cause my blood to stream out on the sidewalk and beside a tree, on the ice and the water. I tried to save myself. I got up, I tried to put my little belongings in my bag, but I couldn't get them. But, I walked towards home, the only route I knew for years, and I got to my house and I gave out; I gave out, I ran out of gas, and so I just lay there with my back to the steps and my head resting against it. My friend had given me a couple of Reader's Digests which I dropped on the steps, filled with blood. I didn't want to die. Why did I have to die? . . . '

\* \* \* \* \* \*

"And I think Mr. Sweeney would say, 'The only way you couldn't find this defendant guilty of murder of the first degree is for me to come alive again before your very eyes and walk out of that door to my house.' "

Similarly, in *Commonwealth v. Harvell*, 458 Pa. 406, 409, 327 A.2d 27, 29 (1974), we reversed because of the following remarks:

". . . I say, who thinks of the decedent, the victim? Whoever thinks of him? Who? I believe that if Mr. Holley were able to come back here and sit in this chair and talk with you, I believe he would say, 'I didn't want to die. I didn't want to die. I don't know why Harvell chose to play God and say at what moment of time I should die. I still had some life ahead of me. I was breathing this good

air. I wasn't on welfare taking advantage of people. I was working for Mr. Robinson for the meager amount of money that I needed to live on. I didn't want to die.' And if you, ladies and gentlemen of the jury, allow this defendant, based upon this evidence, to leave City Hall and walk the streets again, how many more Thomas Holleys will have to say 'I didn't want to die'? And the only way you cannot find this defendant guilty of murder of the first degree is for Thomas Holley to come walking through that door, but we won't. Thomas Holley is dead because of this defendant."

Finally, in *Commonwealth v. Mikesell*, 475 Pa. 589, 592, 381 A.2d 430, 432 (1977), we granted a new trial where the prosecutor's closing remarks contained, *inter alia*, the following: [1]

"You have had word of the defendant on this, and he tells you, you heard his story, and I am quite sure all of you have used the expression *'Well, there are two sides to something like this.' I would like to hear what the other guy had to say before I pass judgment. Well, that witness we don't have. Two of them [the victims], we don't have, to know what their view of the situation was, and what happened down there at the corner of Davis and California.* So the Commonwealth is utterly silent in that, and we can't avoid it." (Emphasis in original).

We believe, however, that none of the above cited cases are controlling in the instant matter.

In *Commonwealth v. Stolzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975), we stated:

" . . . But even where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. *Commonwealth v. Crittenton*, 326 Pa. 25, 31, 191 A. 358 (1937); *Commonwealth v. McHugh*, 187 Pa.Super. 568, 577, 145 A.2d 896 (1958). The language must be such that its 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias

1. The prosecutor also argued at great length about the orphaned son of one of the victims.

and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.' *Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). See also *Commonwealth v. Myers*, 290 Pa. 573, 139 A. 374 (1927). The effect of such remarks depends upon the atmosphere of the trial, *Commonwealth v. Dickerson*, 406 Pa. 102, 110, 176 A.2d 421 (1962); *Commonwealth v. Del Giorno*, 303 Pa. 509, 519, 154 A. 786 (1931), and the proper action to be taken is within the discretion of the trial court. *Commonwealth v. Silvis*, 445 Pa. 235, 237, 284 A.2d 740 (1971); *Commonwealth v. Simon*, supra."

In *Mikesell, Harvell* and *Lipscomb*, the remarks were flagrant appeals to the sympathy of the jury. Further, no cautionary instructions were given. Instantly, while the questioning was improper, we do not believe said questioning rises to the level of reversible error, especially since the trial court immediately cautioned the jury to disregard the remarks.

■ Appellant next argues that the trial court erred in allowing the prosecutor to impeach appellant's trial testimony by using his silence at the time of arrest. If appellant's characterization of what occurred was correct, we would grant a new trial, as it is well-settled that a defendant's invocation of his Fifth Amendment privilege may not be used against him in any fashion at trial. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Commonwealth v. White*, 482 Pa. 197, 393 A.2d 447 (1978); *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972). The facts of the instant case, however, do not justify invocation of the aforementioned principal.

Shortly after the shooting in this case, the police contacted appellant. After being given his required *Miranda* warnings, which he waived, appellant gave a statement in which he admitted going to his car and getting a shotgun when the victim became verbally abusive. Upon reentering his establishment, according to the statement, appellant and the victim began wrestling for the gun when it went off, killing the victim. At no time did appellant invoke his Fifth

Amendment privilege. At trial, appellant offered similar testimony but he added one crucial fact, i. e., he was unaware that the shotgun was loaded. On cross-examination of appellant by the prosecutor, the following exchange occurred:

"Q. And you told them that it was an accident?

"A. Yeah.

"Q. Pardon me?

"A. Yeah, I told them it was an accident.

"Q. But you never told anybody, and you have three times now, according to your testimony, that you said anything about this thing; once when the police were there at 341 East 14 Street, is that right?

"A. Yeah.

"Q. The second time you talked about it you were at the police station?

"A. Yeah.

"Q. And the third time, from what I gathered your testimony, you talked about it while you were being taken from City Hall upstairs in this building to the fifth floor, that you told them it was an accident.

"A. I told Dave it was an accident.

"Q. So that's three times you told somebody; I mean, I'm talking about officials; that's three times you told somebody about what happened. Is that right?

"A. Yeah.

"Q. But you never told these people, did you, you never told them that you didn't know the gun was loaded.

"A. Yes.

"Q. You never told them that.

"A. Yes.

"Q. You never told the man that you didn't know the gun was; how could it go off; you didn't know it was loaded. You never told anybody that, did you Mr. Beavers?

"A. No one ever asked me.

"Q. Is that why you didn't tell them?

"A. Yeah.

"Q. I mean, are you telling us today the reason why you didn't tell anybody that this weapon wasn't loaded was because they forgot to ask you?

"MR. AMBROSE [Defense Counsel]: Your Honor, I would object. He has a right to make statements or not make statements. He was under no compulsion. He could stop at any time and I think that's improper to ask questions along those lines."

Appellant believes that the above-quoted cross-examination amounted to an impermissible reference to an exercise of his Fifth Amendment privilege against self incrimination.

In *Commonwealth v. Haideman, supra,* 449 Pa. at 370, 296 A.2d at 766–67, we stated:

"Testimonial reference to an accused's silence and his request for a lawyer at time of arrest is a constitutionally impermissible violation of the accused's Fifth Amendment right. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229 [14 L.Ed.2d 106] (1965), the Supreme Court held that the Fifth Amendment 'forbids either comment by the prosecution on the accused's silence [at trial] or instructions by the court that such silence is evidence of guilt.' Id. at 615, 85 S.Ct. at 1233.

"The difference between prosecutorial use of an accused's silence at trial and the use of an accused's silence at time of arrest is, as one court stated, 'infinitesimal.' *Gillison v. United States,* 399 F.2d 586, 587 (D.C.Cir.1968). In both instances, the defendant's silence is exploited as evidence of guilt." (Emphasis added.)

Further, in *Doyle v. Ohio, supra,* the defendant therein did not make any statement following his arrest. At trial, the defendant gave an exculpatory explanation of the events which led to his arrest. On cross-examination, the prosecutor asked the defendant why he had not told the exculpatory version of the events at the time of his arrest. As the court stated:

" . . . The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443–444 [94 S.Ct. 2357, 2363–2364, 41 L.Ed.2d 182] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale*, supra, [422 U.S.] at 177, [95 S.Ct. at 2137]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio, supra*, at 617–18, 96 S.Ct. at 2244–45 (Footnotes omitted).

We believe that neither *Haideman* and its progeny nor *Doyle* are controlling in the instant matter because of one very important distinction. In this case, appellant never attempted to invoke his Fifth Amendment privilege; to the contrary, appellant instantly freely spoke with the police after waiving his *Miranda* rights. The prosecutor in this case was merely attempting to impeach appellant's credibility by pointing out an inconsistency between appellant's post-arrest statement and his trial testimony. The prosecutor was not using an exercise of a constitutional right by appellant as evidence of his guilt.

In his brief, appellant states:

"The Defendant recognizes that he did not explicitly state to the police officers that he chose to exercise his privilege to remain silent. However, it is the Defendant's contention that such a statement is not constitutionally

required. Rather, a person accused of criminal activity and in the custody of law enforcement officials has the absolute right to stop speaking to those officials at any time. The right to exercise one's Fifth Amendment privilege does not terminate upon making a partial statement to law enforcement officials. Rather, it is a right which may be exercised at any time, whether explicitly stated or by implication through a failure to respond."

█ We must first note that this record contains no indication that appellant ever failed to respond to a question propounded by the police. Where a defendant, having been advised of his *Miranda* rights, freely speaks to authorities and never fails to respond to a question, we fail to see how any claim of privilege can be asserted.

Appellant relies heavily on *Charles v. Anderson*, 6 Cir., 610 F.2d 417, which held that on facts identical to the instant case, said questioning was improper. With all due respect to that court, we believe *Charles* is incorrect for the reasons previously set forth; i. e. the defendant there neither explicitly exercised the privilege nor impliedly did so by failing to respond to a question of the police. Appellant's argument is thus without merit.

█ Appellant finally argues that the trial court erred in overruling his objection to a certain portion of the prosecutor's closing argument. As part of appellant's testimony, he told the jury he had purchased the shotgun on the day of the killing from a truck driver named "Jim". Commenting on appellant's assertion that he didn't know the gun was loaded, the prosecutor remarked:

"Now, I'm going to ask you jurors to put yourself in that position that Mr. Beavers says he was in one moment after that gun was fired. Try to project yourself back to April 9, 1978 and try to project yourself as being armed with the story Mr. Beavers arms you with, and that is how he got the gun and how it was loaded and so forth. What would you tell the police? What would you tell anybody immediately? You would say 'my God, the gun went off; I didn't know it was loaded; I'm going to bring that man

in this courtroom who will show and testify to you that he brought that gun to the back door of my premises at 11:00 this morning'."

Defense counsel objected, arguing that the appellant had no burden to produce any evidence. The court overruled the objection and later charged the jury as follows:

"You will note that in the final summation of the District Attorney the attorney for the defendant objected at one point because he felt that the Commonwealth was indicating to you that the defendant had a burden of proving his innocence in this case, and that's not correct in the sense that the Commonwealth is never relieved of its obligation of proving the guilt of the defendant beyond a reasonable doubt. The defendant does not have any burden of proving his innocence. The burden is entirely upon the Commonwealth, and that is one of proving guilt beyond a reasonable doubt."

In light of the court's instructions to the jury about the Commonwealth's never shifting burden of proof, we find no merit to appellant's argument.

Appellant also believes the above-quoted portion of the closing arguments was an improper comment on appellant's exercise of his Fifth Amendment privilege against self incrimination. As previously explained, appellant never attempted to exercise said privilege and that analysis is equally apt to this argument.

Judgment of sentence affirmed.

NIX, J., joins in the opinion of the court and files a separate concurring opinion, which FLAHERTY, J., joins.

ROBERTS, J., files a dissenting opinion.

NIX, Justice, concurring.

I join the opinion of Mr. Chief Justice O'Brien and now write to explain my difference with the reasoning of the dissenting opinion of Mr. Justice Roberts. The majority conceded the impropriety of the questioning of appellant on cross-examination. Nonetheless, it distinguished the facts

534

of this case from those presented in *Commonwealth v. Harvell*, 458 Pa. 406, 327 A.2d 27 (1974) and *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974).

The first basis for distinction is that the prosecutorial misconduct in this case was clearly not as egregious as that occurring in *Harvell* and *Lipscomb*. This difference is not disputed by Mr. Justice Roberts in his dissent. The second basis for distinction was that in the instant case the defense's objection was sustained, thereby immediately informing the jury of the impropriety, and cautionary instructions were given. Mr. Justice Roberts' quarrel focuses upon the *legal* accuracy of those cautionary instructions. While in that regard there may be merit, what is critical is that the jury was clearly and immediately advised that the improper question was to be disregarded. This prompt response, in my judgment, was sufficient to overcome any taint that may otherwise have flowed from the question.

The explanation as to why the remark was improper may have been erroneous but the objective (advising the jury of that impropriety) was accomplished. Because all of the niceties and the refinements of the law are not met, does not warrant the disturbing of a verdict where the trial was essentially fair and no prejudice has been demonstrated.

FLAHERTY, J., joined in this opinion.

ROBERTS, Justice, dissenting.

In the presence of the jury, the prosecuting attorney asked appellant, "[the victim] can't be here to tell these people what took place, can he?" Mr. Chief Justice O'Brien correctly concludes that this questioning was improper. Cf. *Commonwealth v. Black*, 480 Pa. 394, 390 A.2d 750 (1978) (condemning prosecutorial tactic of directing jurors' attention to rear of courtroom to wait for deceased to walk through door). Yet he concludes that the improper questioning does not constitute reversible error, "especially since

the trial court immediately cautioned the jury to disregard the remarks." I must dissent.

On no reading of the record can it be said that the court adequately cautioned the jury. The court told the jury, "it's more a matter for argument than anything else." Contrary to the assertion of the trial court, the prosecuting attorney's remark that the victim "can't be here to tell these people what took place" is not a matter for argument, or any other aspect of the prosecution's case. The Supreme Court of the United States often has repeated that

> "a prosecutor 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a particular and definite sense the servant of the law. . . .' "

*Gannett Co. v. DePasquale*, 443 U.S. 368, 384 n.12, 99 S.Ct. 2898, 2908 n.12, 61 L.Ed.2d 608 (1979), quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). So too, this Court has stated: "In advocating the cause for this Commonwealth, prosecutors are to seek justice, not only convictions." *Commonwealth v. Cherry*, 474 Pa. 295, 301, 378 A.2d 800, 803 (1977).

The American Bar Association's Standards Relating to the Prosecution Function provide:

> "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury."

ABA Project on Standards for Criminal Justice, § 5.8(c) (Approved Draft, 1971). And we held that "[t]he determination of guilt must *not* be the product of fear or vengeance, but rather intellectually compelled after a disinterested, impartial and fair assessment of the testimony that had been presented." *Commonwealth v. Harvell*, 458 Pa. 406, 411, 327 A.2d 27, 30 (1974). Because the prosecuting attorney's improper remark frustrated a disinterested, impartial and fair assessment, appellant must be awarded a new trial.