J-A01018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| C.W., JUVENILE | |
| Appellant | No. 3470 EDA 2014 |

Appeal from the Dispositional Order November 5, 2014
In the Court of Common Pleas of Lehigh County
Juvenile Division at No(s): CP-39-JV-0000302-2014
SID NO. 41678445

BEFORE:  LAZARUS, J., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                              **FILED JUNE 27, 2016**

C.W., a minor,[1] appeals from the dispositional order entered November 5, 2014, by the Lehigh County Court of Common Pleas, Juvenile Division. The juvenile court adjudicated C.W. delinquent on charges of harassment and ethnic intimidation,[2] and entered a dispositional order placing C.W. on official probation.  On appeal, C.W. argues the juvenile court erred in finding that he knowingly, intelligently, and voluntarily waived his **Miranda**[3] rights,

_____

[*] Former Justice specially assigned to the Superior Court.

[1]  C.W.'s date of birth is August 22, 1999.

[2]  18 Pa.C.S. §§ 2709(a)(1) and 2710, respectively.

[3]  **Miranda v. Arizona**, 384 U.S. 436 (1966).

and there was insufficient evidence to support his adjudications for harassment and ethnic intimidation. For the reasons that follow, we affirm.

The trial court set forth the facts as follows:

On April 24, 2014, at approximately 1 p.m., N.G., a 12th grader at William Allen High School, located in Allentown, Lehigh County, Pennsylvania, was seated at a lunchroom table in the 12th grade cafeteria during a Study Hall. N.G. was seated with two friends, G.S. and G.Z. By way of background, N.G. and G.Z. are Caucasian and G.S. is Hispanic. The three boys were playing a card game. A short time later, [C.W.] and his two friends, F.R. and J.W., entered the room and started to congregate near where N.G. and his friends were sitting. The entire interaction was captured on video, which the Court was able to review at the time of the Adjudicatory Hearing.

The video begins with F.R. operating the camera and J.W. describing the video as "Smack Cam Part 3." F.R. trains the camera on an Allen High School security guard, but then focuses the camera on N.G. and his table. Thereafter, F.R. directs J.W. to "mop his shit" and J.W. smacks N.G. on the back of the head, causing N.G. to turn around and look in the direction from where the smack came. At the time of the Hearing, N.G. testified that he did not feel pain and that he wanted to avoid a confrontation. Therefore, N.G. turned back around and continued to try to concentrate on the cards he was shuffling.

After smacking N.G., F.R. turned the camera on himself and declared that they "mopped that shit." J.W. is next seen in the corner of the cafeteria and F.R. handed the video camera to [C.W.] to continue to film the exchange between J.W., F.R. and N.G.

F.R. again approaches N.G. from behind and began to run his fingers through N.G.'s hair and to speak with N.G. N.G. recalled that F.R. stated that N.G.'s hair was pretty smooth and that he could be F.R.'s daughter. [C.W.] is clearly heard laughing in the background of the video as he films F.R. fondling N.G.'s hair. F.R. and J.W. then asked G.Z. to use his cellular telephone to call F.R.'s mother. G.Z. says no, stating that there was not a lot of battery power left on the telephone. J.W. then told him that he is making up excuses and that there is power on

- 2 -

the telephone. While filming the exchange, [C.W.] continues to giggle, and then to moan/sigh. [C.W.] uses the zoom function on the camera to zoom in and out on N.G. and G.Z.

[C.W.] then sits down at the table with N.G., G.Z., and G.S., handing the video camera back to F.R. to continue to film the exchange. F.R. films G.Z., calling him a "pink ass nigger."

On April 25, 2014, Detective Bill Williams of the Allentown Police Department went to William Allen High School to investigate what had transpired at the school the day before. A video had been posted to F.R.'s Facebook page and administration officials had viewed the video and summoned the police. Detective Williams viewed the video and through investigation, was able to determine the identity of the juveniles seen on the video.

When he arrived at school on April 25, 2014, [C.W.] was summoned to the Principal's Office at the high school. There, he was told that he would not be permitted to leave the office for any purpose until he gave a written account of the incident of the previous day. In the office were the Assistant Principal, a school security office and a uniformed member of the Allentown Police Department. Ultimately, [C.W.] wrote a statement, implicating himself in the incident involving N.G., G.Z. and G.S.

[C.W.]'s mother eventually arrived at school. She and [C.W.] were told that they needed to go to the Allentown Police Department to talk about the incident in the cafeteria. They were transported by a uniformed officer to the police department. After issuing *Miranda* warnings to [C.W.], in the presence of his mother, [C.W.] gave a statement where he admitted to knowing that F.R. and J.W. had approached N.G., G.Z. and G.S. because of their race, recording the Smack Cam incident, and provoking the situation.

Trial Court Opinion, 6/5/2015, at 3-5.

On June 10, 2014, a petition alleging delinquency was filed, charging C.W. with ethnic intimidation and harassment. On August 14, 2014, C.W.'s counsel made an oral motion to suppress and a suppression hearing was

held before a juvenile master. On September 8, 2014, the juvenile master submitted her recommendation that the motion to suppress be denied. On September 9, 2014, the juvenile court adopted the recommendation as an order of the court. No challenge to the master's recommendation was filed pursuant to Pa.R.J.C.P. 192.[4]

The matter proceeded to an adjudication hearing on October 15, 2014.[5] At the conclusion of the hearing, both charges were sustained. On November 5, 2014, C.W. was placed on official probation.[6] This appeal follows.

In C.W.'s first argument, he claims the juvenile court erred by failing to suppress his custodial statements[7] because it was his mother who waived his ***Miranda*** rights, and not C.W. Specifically, he states, "There is not a

_____

[4] Rule 192 provides, in pertinent part: "Time limitation. A party may challenge the master's recommendation by filing a motion with the clerk of courts within three days of receipt of the recommendation. The motion shall request a rehearing by the judge and aver reasons for the challenge." Pa.R.J.C.P. 192(a).

[5] All three juveniles were tried together.

[6] C.W. was permitted to remain at home under the care and responsibility of his mother.

[7] The juvenile court noted that at the conclusion of the suppression hearing, "counsel for [C.W.] and the Commonwealth agreed to the admissibility of [C.W.'s] statement made at the school. Therefore, the writings later submitted to [the master] for her consideration of the [m]otion only addressed the oral and written statements made at police headquarters." Juvenile Court Opinion, 6/5/2015, at 6.

- 4 -

single, reported Pennsylvania case that addresses the precise question of whether or not a parent has the authority to waive a juvenile's constitutional right to be free from self-incrimination in the context of custodial interrogation." C.W.'s Brief at 9. Relying on the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, C.W. asserts the Pennsylvania Legislature did not intend to allow parental waivers generally. *Id.* Moreover, he argues,

> [E]very single case – federal or state – that has examined a juvenile <u>Miranda</u> waiver has used a test that examines the juvenile's competency. <u>See Com. v. Harvey</u>, 571 Pa. 533, 547 (2002) (When looking at the confession of a juvenile, the court must consider the juvenile's age, experience and sophistication and whether an interested adult was present.). If a parent could waive the juvenile's <u>Miranda</u> rights, this test would either be unnecessary or would be supplemented by a similar evaluation of the "interested adult."

*Id.* at 11. C.W. contends the Commonwealth did not present any evidence as to his competency. *Id.*

With respect to this issue, we are guided by the following principles:

Our standard of review in considering an order denying a suppression motion is as follows:

> An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. It is also well settled that the appellate court is not bound by the suppression court's conclusions of law. However, [w]hether a confession is constitutionally admissible is a question of law and subject to plenary review.

Thus, this Court does not, nor is it required to, defer to the suppression court's legal conclusions that a confession or *Miranda* waiver was knowing or voluntary. Instead, we examine the record to determine if it supports the suppression court's findings of fact and if those facts support the conclusion that, as a matter of law, [the juvenile] knowingly and intelligently waived his *Miranda* rights.

[*Commonwealth v. Knox*, 50 A.3d 749, 756-757 (Pa. Super. 2012)] (citations and quotations omitted).

With regard to a juvenile waiving his *Miranda* rights, we preliminarily note:

Regardless of whether a waiver of *Miranda* is voluntary, the Commonwealth must prove by a preponderance of the evidence that the waiver is also knowing and intelligent.

*Miranda* holds that "[t]he [juvenile] may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

A determination of whether a juvenile knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension, and the presence or absence of an interested adult. In examining the totality of circumstances, we also consider: (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to

the detention; (4) the attitude of the interrogator; and (5) "any and all other factors that could drain a person's ability to withstand suggestion and coercion."

…

**Knox**, 50 A.3d at 756-757 (quotations and citations omitted) (italics in original).

**In re V.C.**, 66 A.3d 341, 350-351 (Pa. Super. 2013).

Additionally, with respect waiver, we note:

The basic precepts regarding what constitutes a sufficient waiver of **Miranda** rights have been defined through a line of cases beginning with **Commonwealth v. Bussey**, 486 Pa. 221, 404 A.2d 1309, 1314 (Pa. 1979) (plurality opinion). In that plurality opinion, our Supreme Court rejected the more lenient Federal constitutional rule that a defendant can *implicitly* waive his **Miranda** rights, instead holding that "an explicit waiver is a mandatory requirement." **Id.** at 1314 (emphasis added); **See also North Carolina v. Butler**, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) (holding that under Federal constitutional law, an implicit waiver of **Miranda** rights could be found where an accused expresses an understanding of his rights and gives a statement without expressly waiving the same). Our Supreme Court elaborated that an "explicit waiver" meant "an outward manifestation of a waiver such as an oral, written or physical manifestation." **Id.** at 1314 n. 11.

In **Commonwealth v. Hughes**, 536 Pa. 355, 639 A.2d 763 (Pa. 1994), the Court applied **Bussey** without acknowledging its limited precedential value as a plurality decision. There, the Court found that the defendant had "explicitly waived" his **Miranda** rights by "clearly and unequivocally" indicating that he understood his rights and then responding to the officer's questions. **Id.** at 770. In other words, the defendant's conduct "clearly manifested an intent to waive his rights." **Id.** Similarly, in **Commonwealth v. Bomar**, 573 Pa. 426, 826 A.2d 831 (Pa. 2003), our Supreme Court held that the defendant's twice stating he understood his **Miranda** rights after they were read to him, and answering questions immediately thereafter, sufficiently "manifested the intent to waive his rights." **Id.** at 844 n. 13. Finally, in [**Commonwealth v. Baez**, 21 A.3d 1280

(Pa. Super. 2011)], this Court relied on all of the above-cited Supreme Court cases in concluding that the defendant had sufficiently manifested his intent to waive his **Miranda** rights where those rights were read to him, he indicated one time that he understood them, and then he answered the questions asked by police. **Baez**, 21 A.3d at 1286.

**Commonwealth v. Cohen**, 53 A.3d 882, 886 (Pa. Super. 2012) (footnote omitted).

Lastly, "the *per se* requirement of the presence of an interested adult during a police interview of a juvenile is no longer required. Nevertheless, it remains one factor in determining the voluntariness of a juvenile's waiver of his **Miranda** rights." **In the Interest of T.B.**, 11 A.3d 500, 507 (Pa. Super. 2010). Moreover, in **Commonwealth v. Starkes**, 335 A.2d 698 (Pa. 1975), which both the juvenile master and juvenile court relied on, the Pennsylvania Supreme Court stated:

> Where an informed adult is present the inequality of the position of the accused and police is to some extent neutralized and due process satisfied. However, where the adult is ignorant of the constitutional rights that surround a suspect in a criminal case and exerts his or her influence upon the minor in reaching the decision, it is clear that due process is offended. An uninformed adult present during custodial interrogation presents an even greater liability. The minor in such a situation is given the illusion of protection, but is in fact forced to rely upon one who is incapable of providing the advice and counsel needed in such a situation.
>
> Unless we require police officers to also advise parents, who are in the position to counsel minor suspects during custodial interrogation, we will not only fail to assure the full benefits sought to be attained by this type of counseling but we will also increase the likelihood that the suspect will be misinformed as to his rights.

J-A01018-16

*Commonwealth v. Starkes*, 335 A.2d 698, 703 (Pa. 1975) (footnote omitted).

Here, in finding C.W. did not invoke his *Miranda* rights prior to speaking with the detectives, the juvenile court found the following:

In the case at bar, [C.W.] was fourteen (14) years old at the time of the interview and was in the 9th grade at William Allen High School. On April 25, 2014, [C.W.] was summoned to the principal's office. At some point in time later, [C.W.]'s mother, Keyanda Pierce, arrived at the school and was informed that she and her son had to report to the police station to be interviewed. [C.W.] was not told that he was free to leave or that he could refuse to report to the police station. Ms. Pierce and [C.W.] were escorted to the police station by a uniformed officer.

Upon arrival at the police station, Ms. Pierce and [C.W.] were seated in an unlocked interview room, but were not informed that they could leave either the room or the police department. At approximately 2:05 p.m., Detective Williams began his interview with [C.W.]. Ms. Pierce and [C.W.] consented to having the interview audio recorded.

The detectives explained to [C.W.] that he wished to get some background information and explained the criminal nature of the investigation. Thereafter, Detective Williams read [C.W.], the presence of his mother, his *Miranda* rights. Detective Williams asked [C.W.] if he understood his rights and [C.W.] confirmed that he did. Detective Williams turned off the audio recording and allowed Ms. Pierce and [C.W.] to speak privately.

No testimony was presented as to what was discussed between [C.W.] and his mother. When Detective Williams returned to the room, he asked if they had made their decision as to whether they wished to speak to him. He received an affirmative response from [C.W.]'s mother and the substantive portion of the interview began. [C.W.] did not specifically waive his right to remain silent either orally or by executing a written waiver. However, he never indicated that he did not want to speak with Detective Williams and did, in fact, give oral statements to the detective during the interview.

- 9 -

The interview lasted approximately one hour and forty minutes. Ms. Pierce was present the entire time and was present when [C.W.] penned a written statement after he spoke with the detective. [C.W.], Ms. Pierce, and the detective signed the written statement. Detective Williams testified that he was dressed in plain clothes and did not use any physical, verbal or psychological intimidation during the interview and did not coerce or force [C.W.] to speak to him or to provide a written statement.

Based on the evidence presented at the Suppression Hearing on August 14, 2014, we believe that [the juvenile master's] decision to deny suppression of [C.W.]'s statements to Detective Williams was correct. [C.W.], age 14, appeared to be of normal intelligence and gave responsive answers to the detective.[2] His mother was present during the entire process and no evidence of psychological or physical abuse was presented. [C.W.] himself testified that he was not threatened to give any statements or to talk with the detective. [C.W.] and his mother were informed of [C.W.]'s **Miranda** rights and were provided an opportunity to discuss those rights in private. See **Commonwealth v. Waters**, 483 A.2d 855, 859 (Pa. Super. 1984). Further we agree that Ms. Pierce acted as an interested adult on behalf of [C.W.]. Though she may have been angry and frustrated with the actions of [C.W.], such disposition does not render her uninterested. See **Commonwealth v. Laudenberger**, 715 A.2d 1156, 1159 (Pa. Super. 1998) (determining that "the fact that appellant's mother was upset with him is as indicative of concern as it is of disinterest.").

_____

[2] Although counsel for [C.W.] argued that [C.W.] possessed below level intelligence, no evidence was presented to substantiate that argument. As highlighted in the Commonwealth's Letter Brief, no intelligence testing results, school performance records or education plans/placement records were submitted to [the juvenile master] for her consideration. Defense counsel suggested that [C.W.] demonstrated below average intelligence when he did not know his social security number and made a minor mistake reciting his address during his interview. The Commonwealth highlighted that [C.W.] did, in fact, correctly state his full name, age, birth date, height,

weight, and city of birth. We do not believe that a minor mistake and unawareness of a social security number equates to below average intelligence in a 14 year old. Furthermore, Detective Williams testified that [C.W.] appeared to understand the questions posed by the detective and gave appropriate answers to those questions during the interview.

_____

While it is true that [C.W.]'s mother indicated their desire to speak with the police, and [C.W.] himself did not, evidence was presented that [he] answered questions during the interview and did not give any indication to Detective Williams that he either wished to speak to an attorney, wished to stop the interview, or refused to answer any questions posed to him by the detective. Pursuant to **Commonwealth v. Marrero**, 687 A.2d 1102, 1106 (Pa. 1996), "where a defendant neither explicitly invokes his **Miranda** rights nor declines to answer questions asked of him, there is no invocation of those rights." (citing **Commonwealth v. Beavers**, 492 Pa. 522, 532, 424 A.2d 1313, 1318 (1981)). We do not believe that [C.W.]'s actions constituted an invocation of his **Miranda** rights.

Juvenile Court Opinion, 6/5/2015, at 8-11.

We agree with the juvenile court's well-reasoned decision. Based on the record, C.W.'s conduct, in conjunction with his mother's actions, "clearly manifested an intent to waive his rights[.]" **Cohen**, 53 A.3d at 886. We emphasize the following factors: (1) C.W. consented to having the interview audio-recorded; (2) the officer read C.W. his **Miranda** rights and C.W. indicated that he understood them; (3) C.W. was given time to speak with his mother privately before answering any questions; (4) although his mother indicated he was ready to speak, C.W. did not indicate that he did not want to speak with the officer; (5) C.W. did give an oral statement to police; and (6) C.W. provided a written statement as well. As such, we

- 11 -

conclude C.W.'s conduct manifested his understanding of his **Miranda** rights, and he validly waived the same by speaking with the interrogating officer. C.W.'s argument that he, himself, did not explicitly waive his rights, but rather it was his mother,[8] does not persuade us otherwise. Further, in accordance with **Marrero**, **supra**, and **Beavers**, **supra**, C.W. never attempted to invoked his Fifth Amendment privilege when he began to speak freely with the officer and never failed to respond to a question. Therefore, we find no abuse of discretion in this regard, and the juvenile court did not err in denying his motion to suppress.

In C.W.'s next issue, he claims the juvenile court erred in finding he was an accomplice to harassment under 18 Pa.C.S. § 2709(a)(1).[9] C.W.'s Brief at 12. First, C.W. contends his mere presence at the scene does not make him an accomplice. **Id.** at 13. Second, he argues that his filming of

---

[8] Moreover, we note his mother's presence was just one factor to consider in assessing the validity of his waiver.

[9] With respect to the harassment offense, the juvenile court indicated the June 10, 2014, petition alleging delinquency as well as Exhibit A (Offenses Alleged on the Juvenile Petition) of the October 15, 2014, adjudicatory hearing order pertain to harassment under Subsection 2709(a)(3) ("engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose"). Juvenile Court Opinion, 6/5/2015, at 1 n.1. While the Commonwealth did not move to amend the subsection, both parties and the juvenile court proceeded with the hearing and ultimate adjudication as if C.W. was charged with Subsection 2709(a)(1). **Id.** Accordingly, because there was no surprise during the adjudication proceeding and C.W. does not raise any prejudice argument with respect to the apparent scrivener's error on appeal, we will treat the matter as though C.W. was adjudicated pursuant to Subsection 2709(a)(1).

the incident does not make him an accomplice because he did not initiate the attack and he was not the initial recorder. *Id.* Moreover, C.W. states, "No evidence was presented that [he] was involved in that posting or that it was viewable on any of [his] social media sites." *Id.* Lastly, he alleges he did not make any statements inciting or encouraging his co-defendants to act. *Id.* at 14.

> "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, *Patterson v. Pennsylvania*, 135 S. Ct. 1400, 191 L. Ed. 2d 373, 2015 U.S. LEXIS 1333, 2015 WL 731963 (U.S. 2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Watley*, 2013 PA Super 303, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record ... and all evidence actually received[.]" *Id.* (internal quotation marks and citation omitted). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Commonwealth v. Kearney*, 2014 PA Super 97, 92 A.3d 51, 64 (Pa. Super. 2014) (citation omitted), *appeal denied*, 101 A.3d 102 (Pa. 2014). "Because evidentiary sufficiency is a question of law, our standard of review is de novo and our scope of review is plenary." *Commonwealth v. Diamond*, 623 Pa. 475, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), *cert. denied*, *Diamond v. Pennsylvania*, 135 S. Ct. 145, 190 L. Ed. 2d 107 (2014).

*In re C.R.*, 113 A.3d 328, 333-334 (Pa. Super. 2015).

The offense of harassment is defined, in relevant part, as follows:

A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

(1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same[.]

18 Pa.C.S. § 2709(a)(1). In order to meet its burden of proof under this section, the Commonwealth must "prove [the] appellant had the intent to harass, annoy or alarm." *Commonwealth v. Wheaton*, 598 A.2d 1017, 1020 (Pa. Super. 1991). "Anything less than a showing of intent is insufficient." *Id.* (citation omitted). "An intent to harass may be inferred from the totality of the circumstances." *Commonwealth v. Cox*, 72 A.3d 719, 721 (Pa. Super. 2013) (citation omitted).

C.W. was found to be an accomplice to the harassment charge pursuant to 18 Pa.C.S § 306, which provides, in pertinent part:

§ 306. Liability for conduct of another; complicity

(a) General rule.—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

…

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

…

(ii) aids or agrees or attempts to aid such other person in planning or committing it[.]

18 Pa.C.S. § 306.

Here, the evidence presented at the adjudication hearing, including the video at issue, established that C.W. and his two co-defendants entered the cafeteria together. They congregated near the table where the victim and his two friends were playing cards. One co-defendant, F.R., operated the camera, announced the video they were making was called "Smack Cam Part 3," and told the second co-defendant, J.W., to hit the victim's head. J.W. then walked up to the victim from behind and smacked him on the back of the head. F.R. handed the camera to C.W. to continue filming the incident. While C.W. filmed, F.R. ran his hand through the victim's hair, commented on its smoothness, and said the victim could be his daughter. F.R. tried to procure the phone of the victim's friend to call his mother. During the filming, C.W. is heard giggling, moaning, and sighing. C.W. then gave the camera to F.R., who continued filming and made a derogatory comment toward the victim's friend.

As provided above, the totality of the evidence presented in the matter at issue, viewed in the light most favorable to the Commonwealth, establishes that C.W. acted as an accomplice in committing the harassment offense. He entered the cafeteria with his two co-defendants, he stood by as F.R. smacked or struck the victim on the back of the head, and he also took part in filming the incident. F.R.'s intent to harass can be established by circumstantial evidence, in which he interacted with the victim and struck

him with the purpose of annoying him. *See* 18 Pa.C.S. § 2709(a)(1); *see also Wheaton*, *supra*. Moreover, C.W. was not merely present at the scene as his actions demonstrated an intent to aid F.R. in committing the offense. *See* Pa.C.S. § 306. Likewise, the fact that he did not engage in any activity regarding the uploading of the video to social media is of no consequence. It is the juveniles' actions at the time of the incident that is the focus of our inquiry. Therefore, C.W. is criminally responsible for the acts of his co-defendants, and he was properly adjudicated of harassment.

In C.W.'s final argument, he claims the juvenile court erred in finding the Commonwealth proved he was an accomplice to the offense of ethnic intimidation under Section 2710. *See* C.W.'s Brief at 14. He notes, "There are no reported cases addressing accomplice liability for ethnic intimidation, and this Court has never upheld a conviction for ethnic intimidation in the absence of either extreme violence or an ongoing course of conduct." *Id.* at 15. Moreover, C.W. asserts case law has demonstrated that "a person does not commit ethnic intimidation simply by using an isolated racial slur during the commission of an offense; more is needed to demonstrate the requirement of hatred." *Id.* at 16. Lastly, he contends:

> [T]he Commonwealth presented no evidence that [C.W.] acted with the intent to promote or aid that offense, as is required to be an accomplice under Section 306. Ethnic intimidation is not a result-based offense; it is not concerned with the outcome of prohibited conduct. Rather, it is an intent-based offense concerned only with why some prohibited conduct occurred. It is an offense committed, or not committed, solely within the heart and mind of a particular actor. In adjudicating [C.W.] as an

accomplice to ethnic intimidation, the Court necessarily found that he specifically intended to promote or facilitate the offense of ethnic intimidation, and further he took or attempted some action in furtherance of that offense. In so finding, the Court must also have found that [C.W.] was aware of, and supported, F.R.'s internal motivation and racial animus. The Commonwealth simply presented no evidence from which that finding can be reasonably inferred.

*Id.* at 16-17.

Keeping our standard of review in mind with respect to sufficiency of the evidence, we note the following. The offense of ethnic intimidation is defined as:

A person commits the offense of ethnic intimidation if, with malicious intention toward the race, color, religion or national origin of another individual or group of individuals, he commits an offense under any other provision of this article or under Chapter 33 (relating to arson, criminal mischief and other property destruction) exclusive of section 3307 (relating to institutional vandalism) or under section 3503 (relating to criminal trespass) with respect to such individual or his or her property or with respect to one or more members of such group or to their property.

18 Pa.C.S. § 2710(a).[10] "Malicious intention," under this section, "means the intention to commit any act, the commission of which is a necessary element of any offense referred to in subsection (a) motivated by hatred

---

[10] "Ethnic intimidation is by its explicit terms a contingent crime, proof of which is dependent upon the establishment of a predicate crime." ***Commonwealth v. Magliocco***, 806 A.2d 1280, 1285 (Pa. Super. 2002). As indicated above, the juvenile court found that C.W. committed the predicate offense of harassment. 18 Pa.C.S. § 2709(a)(1).

toward the race, color, religion or national origin of another individual or group of individuals."  18 Pa.C.S. § 2710(c).

> Our Courts have had limited opportunity to apply [S]ection 2710.  Nevertheless, our decisions suggest that "malicious intention" as required by the language of [S]ection 2710(c) may be found to exist only where the circumstances establish that the defendant was motivated by animus toward the victim's race or ethnicity and targeted the victim expressly on that basis.

*Commonwealth v. Sinnott*, 976 A.2d 1184, 1189-1190 (Pa. Super. 2009).

In finding there was sufficient evidence to support the charge of ethnic intimidation, the juvenile court opined:

> There are a limited number of decisions by the appellate courts pertaining to ethnic intimidation.  In *Commonwealth v. Rink*, 574 A.2d 1078 (Pa. Super. 1990), a conviction of ethnic intimidation was upheld where "the defendant participated with a group of teenagers in the beating of a black male in front of the black male's residence.  During the incident, the defendant was heard urging the group to "kill the nigger; get him."  *In re: M.J.M.*[,858 A.2d 1259, 1263-1264 (Pa. Super. 2004)] (citing *Rink* at 1080).  The defendant also punched the victim's wife and called her "bitch" and "nigger."  *Id.*  The Superior Court affirmed the decision of the lower court, determining that the remarks were racially motivated and not the result of emotionally charged behavior.  *In re:  M.J.M.*, at 1263-1264 (citing *Rink* at 1081).
>
> In *Commonwealth v. Ferino*, 640 A.2d 934, 935 (Pa. Super. 1994), however, the Superior Court determined that shouting, "I'm going to kill you, you f—king nigger" immediately prior to firing a gun at the victims (one black and one white) []did not constitute sufficient evidence that racial prejudice was the ["]underlying cause for the prohibited behavior."  *Id.* at 938.  The Court explained that "the [defendant's] conduct was isolated in nature, brief in its execution and unattended by any trappings consistent with a finding that the terroristic threat [the predicate crime] had an origin of malicious intent 'motivated by a hatred toward race, color … or national origin' of the victim."  *Id.*

- 18 -

In **Commonwealth v. Sinnott**, 30 A.3d 1105 (Pa. 2011), the Supreme Court of Pennsylvania was called upon to determine "[w]hether, to prove ethnic intimidation pursuant to 18 Pa.C.S. § 2710, the Commonwealth must prove the defendant targeted the victim solely based on the victim's race, color, religion, or national origin." **Id.** at 1107. In that case, the victim left her mother's home to investigate screaming and cursing that she heard outside. Outside, the victim encountered the defendant, "a tenant and employee of her father, throwing power tools her father had given him against the concrete steps."

> When [the victim] asked [the defendant] what was wrong, he said her father cheated him, he was going to take every house her father owned, and then told her, "[Y]ou, M-F'ers, are going to have to go back to Mexico, you wetbacks." He also called [the victim] a "fucking bitch" and "fucking whore." [The victim] told [the defendant that] she was not Mexican, but Puerto Rican, and therefore had as much right to be in the United States as he did; [the defendant] replied, "No you don't, you wetback, go back to the Alamo." [The victim] testified [the defendant] kept talking about the Alamo and how her father "did him dirty," and threatened to kill her father for cheating him.

**Sinnott** at 1106 (internal citations omitted).

The defendant eventually went back in his own home, only to emerge again, "wielding a power drill, which he kept revving. He walked around the block for about 45 minutes, and [the victim called the police.] **Id.** The police arrived and the defendant went back in his home. After the police left, the defendant came back outside, and approached the victim and her mother. The victim "instinctively put her hands up to stop him. Her long nails got caught in his shirt, and as the two struggled, four of her nails were ripped from their nail beds, causing her fingers to bleed." **Id.** The defendant was charged with a variety of crimes, including ethnic intimidation.

After a discussion of the facts and reasoning behind the **Ferino** decision and examination of a Court of Appeals of Michigan decision regarding a similar issue, the Court in **Sinnott** determined that "all that is required [of the ethnic intimidation

statute] is that the ethnically malicious intent be present, concurrent with the underlying criminal act," holding that "the intent element is satisfied if there is evidence that ethnic malice was a motivator for the defendant's criminal act, it need not be the sole motivator." ***Sinnott*** at 1110.

In the case at bar, the entire criminal episode was captured on video, and posted to the Internet as a "smack cam." After Detective Williams learned about the incident and reviewed the video recording of the incident, he interviewed [C.W.] concerning the use of the term "pinks."

[ADA Dimmig].  So, did you ask … C.W. about the term "pink?"

[Detective Williams].  Yes.

Q.  And what did C.W. tell you about the term "pink?"

A.  It was a racial term.

Q.  A racial term?

A.  Yes.

Q.  Not a pinko commie.

A.  No.

Q.  And not a "pink" homosexual.

A.  No.

Tr. at 103-104:19-5.

While it is undisputed that [C.W.] was *not* the individual who actually smacked N.G. in the head, it is clear from the videotape, and from [C.W.]'s statements to Detective Williams that he "aided or agreed or attempted to aid" the actual aggressor in smacking N.G., an action that was based, at least in part, on N.G.'s race.  When [C.W.] and his friends initially approached N.G. and his friends seated at the table in the lunch room, they did so as a unit.  It was clear that [C.W.] did not just *happen* to be in the room in close proximity to the incident.

- 20 -

[C.W.] is initially seen on the approach to the table. Later, the initial person filming the "smack cam" hands the camera over to [C.W.], who continues to film the interactions and is heard laughing, giggling, and making other noises. Additionally, the Commonwealth introduced [C.W.]'s statement, which appears to address the victim, N.G.:

I know you guys are probably mad at the fact that my friends were making front of you because your race and how different ya'll look from every body else, and when one of my friends slaped cam you, and tryed to take you guys phone.

Comm. Exhibit 2, October 15, 2014 (spelling errors in original).

Juvenile Court Opinion, 6/5/2015, at 18-21.

We agree with the court's analysis. Contrary to C.W.'s argument, and as explained above, C.W. was not merely present at the scene and his actions were sufficient to conclude that he acted as an accomplice. Moreover, we point to his confession, which confirms C.W. and his friends targeted and antagonized the victim because of his race.

Furthermore, C.W.'s reliance on case law that a single derogatory comment cannot support a finding of ethnic intimidation is misplaced as **Ferino** is distinguishable from the present matter. In **Ferino**, the evidence merely established the defendant aimed and fired a weapon in the direction of the victims, which was preceded by a pejorative and derogatory threat. Here, C.W. and his cohorts entered the cafeteria with the intent to film and assault the victim because he was of a different race. C.W. admits that their actions were based on race, which establishes a malicious racial animus. **See Sinnott**, 976 A.2d at 1189-1190. Accordingly, we conclude the record

- 21 -

contains sufficient evidence to sustain C.W.'s adjudication for ethnic intimidation. Therefore, we affirm the order of disposition.

Dispositional order affirmed.

Judge Lazarus joins the memorandum.

Justice Fitzgerald files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/27/2016